William E. Thomson, Jr. (SBN 47195)
wthomson@brookskushman.com
BROOKS KUSHMAN P.C.
601 S. Figueroa St., Suite 2080
Los Angeles, CA  90017-5726
Tel:  (213) 622-3003
Fax:  (213) 622-3053

Mark A. Cantor (*Pro Hac Vice*)
mcantor@brookskushman.com
John S. Le Roy (*Pro Hac Vice*)
jleroy@brookskushman.com
Marc Lorelli (*Pro Hac Vice*)
mlorelli@brookskushman.com
John P. Rondini (*Pro Hac Vice*)
jrondini@brookskushman.com
BROOKS KUSHMAN P.C.
1000 Town Center, Twenty-Second Floor
Southfield, MI 48075
Tel.:  (248) 358-4400
Fax:  (248) 358-3351

*Attorneys for Plaintiff Ancora Technologies, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ANCORA TECHNOLOGIES, INC. <br><br> Plaintiff, <br><br> v. <br><br> APPLE, INC., <br><br> Defendant. <br>———————————————— <br> APPLE, INC. <br><br> Counterclaimant, <br><br> v. <br><br> ANCORA TECHNOLOGIES, INC. <br><br> Counterdefendant. | Case No. 4:11-cv-06357-YGR <br><br><br> **ANCORA TECHNOLOGIES, INC.'S OPENING *MARKMAN* BRIEF** <br><br><br> <u>Hearing Date</u>: <br><br> June 15, 2012        10:00 AM <br><br> Hon. Yvonne Gonzalez Rogers |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ...................................................................................... 1

II.     CLAIM CONSTRUCTION LAW .............................................................. 3

III.    CLAIM CONSTRUCTION DISPUTES ..................................................... 5

        A.   "Non-Volatile Memory" .................................................................. 6

        B.   "BIOS" ............................................................................................ 8

        C.   "Program" ..................................................................................... 11

        D.   "Volatile Memory" ....................................................................... 13

        E.   "License Record" .......................................................................... 16

        F.   "verifying the program using at least the verification structure
             from the erasable non-volatile memory of the BIOS" ................ 18

        G.   Apple's "Ordering" Argument ..................................................... 19

IV.     CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007)................................................................ 12

*Baldwin Graphic System v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)................................................................ 19

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed.Cir.2002)................................................................. 3

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)............................................................ 6, 13

*Exxon Research and Eng'g Co., v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001)............................................................ 7, 15

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2011)........................................ 3, 5, 11, 16, 18, 19

*Fuijitsu Ltd. v. Tellabs Operations, Inc.*,
    821 F.Supp.2d 1009 (Fed. Cir. 2011) ...................................................... 14

*Gart v. Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001).............................................................. 2

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004)............................................................... 3

*Howmedica Osteonics Corp. v. Wright Medical Technology, Inc*,
    540 F.3d 1337 (Fed. Cir. 2008).............................................................. 21

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed.Cir.2004).................................................................. 18

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed.Cir. 1995).............................................................. 3, 4, 14

*McCarty v. Lehigh Val R.R.*,
    160 U.S. 110, 16 S.Ct. 240 (1895)........................................................... 17

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
    244 F.3d 1365 (Fed.Cir.2001)................................................................. 5

*O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008)............................................................... 5

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)........................................................... 3, 4, 7, 14, 17, 18,19

*Primos, Inc. v. Hunter's Specialties, Inc.,*
    451 F.3d 841 (Fed. Cir. 2006)........................................................... 11, 21

*Renishaw PLC v. Marposs Societa' Per Azioni,*
    158 F.3d 1243 (Fed.Cir. 1998)........................................................... 17

*Source Search Techs., LLC v. LendingTree, LLC,*
    588 F.3d 1063, 1076 (Fed. Cir. 2009)........................................................... 6, 8, 13, 14

*Southwall Technologies, Inc v. Cardinal IG Company,*
    54 F.3d 1570, 1579 (Fed. Cir. 1995)........................................................... 4

*Silicon Graphics, Inc. v. ATI Tech, Inc.,*
    607 F.3d 784, 798 (Fed. Cir. 2010)........................................................... 5

*Thorner v. Sony Computer Enter. Am. LLC,*
    669 F.3d 1362, 1365 (Fed. Cir. 2012)........................................................... 3, 9, 12, 19

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554, 1568 (Fed. Cir. 1997)........................................................... 3

*Vitronics Corp. v. Conceptronic,* Inc.,
    90 F.3d 1576, 1580 (Fed. Cir. 1996)........................................................... 3, 4, 9

# I.      INTRODUCTION

In December 2010, Ancora Technologies, Inc. ("Ancora") filed suit against Apple, Inc. ("Apple") for infringement of U.S. Patent No. 6,411,941 ('941) titled "Method of Restricting Software Operation Within A License Limitation." (Declaration of John P. Rondini, ¶2, Ex. 1.) The invention, as the title suggests, covers techniques for limiting unauthorized software use on computers.

The '941 invention uses the memory of a computer's Basic Input Output System ("BIOS") to store a "license record" for a licensed program, *i.e.*, a program that is permitted to run on the computer. When the program is executed on the computer, the license record stored in the BIOS is used to "verify" that the program is permitted to run on that computer. Other facets of the invention are recorded in the claims. Claim 1 is reproduced below for reference:

> 1.      A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area the method comprising the steps of:
>
> selecting a program residing in the volatile memory;
>
> using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
>
> acting on the program according to the verification.

A distinguishing aspect of Ancora's invention is the establishment of a "verification structure" in the BIOS memory area of the computer. As recognized in the Background of the '941 Patent, the invention prevents "hacking" and installation of unauthorized software. When the Patent Office allowed the '941 patent, the Examiner extolled some of the virtues of the invention:

> [T]he key distinction between the present invention and the closest prior art, is that [the prior art systems] run at the operating system level and BIOS level, respectively. More specifically, the closest prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS to verify the program using the verification structure and having a user act on the program according to

the verification. Further, it is well known to those of ordinary skill of the art that a computer BIOS is not setup to manage a software license verification structure. The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS.

(Rondini Decl. ¶3, Ex. 2, File History, 2/20/02 Notice of Allowability, ANCA 722.)

The '941 Patent was also subject to a Reexamination Proceeding in the Patent Office. Microsoft requested the re-examination during an earlier dispute with Ancora. Microsoft submitted an exhaustive list of reasons why it believed the '941 Patent should be invalidated. (Rondini Decl. ¶4, Ex. 3, Reexamination File History, Request, ANCA 2409-2447.)   Upon undertaking the Reexamination, the Patent Office concluded: "The patentability of claims 1-19 is confirmed."  (Rondini Decl. ¶5, Ex. 4, Re-Examination Certificate, ANCA 2662.)

Because the validity of the '941 Patent is now beyond dispute, Apple seeks to <u>change</u> the scope of the patent under the guise of claim construction.  But, as the Federal Circuit has repeatedly explained, claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, ***but not to change***, the scope of the claims." *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1339 (Fed. Cir. 2001) (emphasis added).

Apple improperly attempts to narrow the claims in a thinly veiled attempt to avoid infringement of the claims as they are actually written.  While the Court may *interpret* technical claim terms to assist the jury in understanding their meaning, it should not *change* the scope of the claims to something different than what the Patent Office allowed.

1

## II.    CLAIM CONSTRUCTION LAW

2

"It is a bedrock principle of patent law that the claims of the patent define the invention

3

to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303,

4

1312 (Fed. Cir. 2005) (*en banc*) (internal quotation marks omitted).   Claim terms should

5

generally be "given their ordinary and customary meaning" to those skilled in the art as informed

6

by the specification.  *Id.* at 1312-14.  However, it is not necessary to construe every claim.  *E.g.*

7

*Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1207 (Fed. Cir. 2011) (holding that the

8

district court did not err by rejecting defendants' construction and instructing the jury to give the

9

claim term its "ordinary meaning"); *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568

10

(Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy").

11

There are only two exceptions to the general rule that words are generally given their

12

ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own

13

lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the

14

specification or during prosecution." *Thorner v. Sony Computer Enter. Am. LLC,* 669 F.3d 1362,

15

1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic,* Inc., 90 F.3d 1576, 1580 (Fed.

16

Cir. 1996)).  "To act as its own lexicographer, a patentee must 'clearly set forth a definition of

17

the disputed claim term' other than its plain and ordinary meaning." *Id.* (quoting *CCS Fitness,*

18

*Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  "The standard for disavowal of

19

claim scope is similarly exacting." *Id.* at 1366.  "Absent a clear disavowal or contrary definition

20

in the specification or the prosecution history, the patentee is entitled to the full scope of its claim

21

language." *Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1358 (Fed. Cir. 2004).

22

Although a patentee may use the specification to assign unique definitions to claim terms,

23

when it does so expressly and clearly as set forth above, limitations from the written description

24

should not be imported into the claims. *Phillips,* 415 F.3d at 1315-16, 1320, 1323 ([A]lthough

25

the specification often describes very specific embodiments of the invention, we have repeatedly

26

warned against confining the claims to those embodiments."); *Markman v. Westview*

27

*Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996) ("The

28

1   written description part of the specification does not delimit the right to exclude.  That is the

2   function and purpose of the claims.")  Nevertheless, a claim is read "in the context of the entire

3   patent, including the specification."  *Id.* at 1313.  In particular, the description of an embodiment

4   in the specification does not, without more, limit the claims to that single embodiment.  *Id.* at

5   1323 ("we have expressly rejected the contention that if a patent describes only a single

6   embodiment, the claims of the patent must be construed as being limited to that embodiment").

7   A patent's prosecution history can also be considered.  *Id.* at 1317 ("Like the specification, the

8   prosecution history provides evidence of how the PTO and the inventor understood the patent.").

9         While the Court may consider other evidence extrinsic to the patent, the use of extrinsic

10   evidence (such as expert testimony and dictionaries) must be secondary and subservient to the

11   intrinsic evidence.  As explained in *Phillips*, 415 F.3d at 1318, the Federal Circuit "view[s]

12   extrinsic evidence in general as less reliable than the patent and its prosecution history in

13   determining how to read claim terms, for several reasons."  For example, extrinsic evidence is

14   not tied to the teachings of the patent and "undue reliance on extrinsic evidence poses the risk

15   that it will be used to change the meaning of the claims."  *Id*. at 1319.  Indeed, it is improper to

16   rely on extrinsic evidence where "the claims, specification and file history" adequately define a

17   claim term.  *Vitronics*, 90 F.3d at 1583.  The intrinsic evidence defines the public record from

18   which the public is entitled to rely.  *Id.* (citing *Markman,* 52 F.3d at 978-79.)  "Allowing the

19   public record to be altered or changed by extrinsic evidence introduced at trial, such as expert

20   testimony, would make this right meaningless."  *Id.*  (citing *Southwall Technologies, Inc. v.*

21   *Cardinal IG Company*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

1

### III.    CLAIM CONSTRUCTION DISPUTES

2

Apple contends that almost every claim term of the asserted independent claim 1 requires

3

construction in this case.  Claim 1 is reproduced below with the bolded language Apple has

4

identified  for construction.

5

6

1.   A method of restricting software operation within a license for use with a computer including an erasable, **non-volatile memory** area of a **BIOS** of the computer, and a **volatile memory** area; the method comprising the steps of:
        selecting a **program** residing in the **volatile memory**,
        using an agent to set up a **verification structure** in the erasable**, non-volatile memory** of the **BIOS, the verification structure accommodating data that includes at least one license record**,
        **verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS**, and
        acting on the program according to the verification.

7

8

9

10

11

12

Claim construction is not a right.  Claims are only construed when there is an "actual

13

dispute" concerning the meaning a particular claim term.  *O2 Micro Intern. Ltd. v. Beyond*

14

*Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  And, if concluding that

15

the ordinary meaning applies, that is all claim construction requires.  *Finjan*, 626 F.3d at 1207

16

(holding district court did not err by rejecting defendant's construction and instructing jury that

17

ordinary meaning applies); *Silicon Graphics, Inc. v. ATI Tech., Inc.*, 607 F.3d 784, 798 (Fed. Cir.

18

2010) (affirming district court's choice to state term's ordinary meaning applies rather than

19

providing construction.); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380

20

(Fed. Cir. 2001).

21

No bonafide dispute over the meaning of the claim terms exist in this case.  Apple – not

22

Ancora – has requested all of the constructions at issue.  Ancora does not believe that claim

23

construction is necessary for any claims.  The patent claims are easily understood by one skilled

24

in the art.  What is revealed by Apple's excessive terms and detail-laden constructions is that

25

Apple seeks to avoid infringement of the claims *as actually written*.

26

Until Ancora receives Apple's claim construction brief, it is unable to understand the full

27

nature of Apple's alleged dispute over the identified claim terms.  Accordingly, Ancora will

28

appropriately and fully respond in its reply brief.  This is especially true on the terms that Apple contends are indefinite, a contention for which Apple bears the burden of proof by clear and convincing evidence.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005).

The parties have agreed on the construction for one phrase as set forth below.

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "verification structure accommodating data that includes at least one license record" | data structure for verifying whether a program is licensed that includes at least one license record |

### A.      "Non-Volatile Memory"

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| "non-volatile memory" | memory that is maintained when the power is removed | Indefinite |

This term is recited throughout claim 1 and, as Apple's expert admits, is well-known to those of skill in the art: "the ordinary meaning of 'non-volatile memory' is memory that does not lose its data when power is removed." (Rondini Decl. ¶ 7, Ex. 6, Kelly Decl., ¶23.)[1]  Indeed, Apple has 600 U.S. patents that describe "non-volatile memory."  (Rondini Decl. ¶ 17, Ex. 16.) Despite this reality, Apple contends that the term is "indefinite," *i.e.*, it cannot possibly be construed.

Indefiniteness is an invalidity defense that Apple must establish by clear and convincing evidence.  *Datamize,* 417 F.3d at 1348.  A claim may be held invalid as indefinite only if it is *impossible* to understand.  *Source Search Techs., LLC v. LendingTree, LLC,* 588 F.3d 1063, 1076 (Fed. Cir. 2009) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have

---

[1]  Ancora's expert similarly contends that "information stored in non-volatile memory is preserved for use after the power is removed."  (Rondini Decl. ¶ 6, Ex. 5, Jestice Decl., ¶5.)

held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. Only claims not amenable to construction or insolubly ambiguous are indefinite.") (citations and internal quotation marks omitted).   Indeed, only where "a claim is insolubly ambiguous, and no narrowing construction can properly be adopted" can a claim be indefinite.  *Exxon Research and Eng'g Co., v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Apple's expert acknowledges that the '941 Patent does not provide a special meaning or definition for the term "non-volatile memory." (Rondini Decl. ¶9, Ex. 8, Kelly Dep. Tr. at p. 77, line 20 - p. 78, line 2.)  Despite this acknowledgement that the term "non-volatile memory" is well known to those of skill in the art (Rondini Decl. ¶7, Ex. 6, Kelly Decl., ¶23), Apple's expert inexplicably contends that the term is "hopelessly ambiguous" (*Id.*, Ex. 6, Kelly Decl., ¶21). Neither Kelly, nor Apple, has provided any analysis whatsoever to support this bald contention.

To the extent the Court is inclined to construe the term "non-volatile memory," it should adopt the "standard definition" that the Patent Examiner expressly provided during the original examination of the '941 Patent:

> the standard definition of "non-volatile" memory [is] memory that is maintained even when the power is removed from the storage system

(Rondini Decl. ¶3, Ex. 2, 6/21/01 Office Action, ANCA 669-670.)

This is the definition provided in the intrinsic record and should be adopted.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips,* 415 F.3d at 1317.   The '941 patent similarly references ROM and E$^2$PROM when discussing non-volatile memory.  (Rondini Decl. ¶2, Ex. 1, Col. 1, line 65 – col. 2, line 1; col. 4, lines 51-52.)

Consistent with the specification and prosecution history, third party publications also confirm this well-understood meaning.  (Rondini Decl. ¶8, Ex. 7, ANCA 2870, The Microsoft Computer Dictionary (1998), p. 246:  "**nonvolatile memory** *n.*  A storage system that does not lose data when power is removed from it.  Intended to refer to core memory, ROM, EPROM, flash memory.")

Because the term "non-volatile memory" is well-known to those of skill in the art (including Apple and its expert), the term is amenable to construction and is, therefore, not indefinite. *Source Search Techs., LLC v. LendingTree, LLC,* 588 F.3d at 1076 ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. Only claims not amenable to construction or insolubly ambiguous are indefinite."). Apple has not proposed a construction for "non-volatile memory." Ancora's construction should be adopted.

**B.    "BIOS"**

| Claim Term/Phrase | Ancora Construction | Apple Construction |
| --- | --- | --- |
| "BIOS" | software routines that handle startup operations | software routines on IBM PC compatible computers that handle startup operations and support the transfer of data among peripheral devices |

This term also first appears in preamble of claim 1: "a computer including an erasable, non-volatile memory area of a ***BIOS of a computer***." (emphasis added). Again, the Examiner provided an express definition during prosecution of the '941 patent. The Examiner stated:

> The Microsoft Computer Dictionary, 5th Edition, 2002 defines BIOS as "<u>the set of essential software routines that test hardware at startup, starts the operating system, and supports the transfer of data among hardware devices.</u>" ***This definition is consistent with the specification of the '941 patent.*** Since a BIOS is therefore defined by the functional descriptive material contained within it, one skilled in the art would consider any non-functional descriptive material, such as tables, to be part of the BIOS only if it is made and used by the functions of the BIOS itself. This does not preclude such material being also used or modified by programs located outside of the BIOS, such as applications running in an operating system. The fact that a program or table resides in non-volatile memory does not necessarily mean that it is part of the BIOS. It is therefore the case that a reasonable examiner would only consider a table to be in a BIOS if it were, at a minimum, created by a function residing in the BIOS.

(Rondini Decl. ¶4, Ex. 3, Order Granting Request for Reexamination, pp. 8-9, ANCA 2568-2569.)

Apple seeks to deviate from the Examiner's construction in two significant ways. First, Apple injects "IBM PC" in a blatant attempt to exclude computers bearing Apple's brand. No law supports Apple's request to limit a claim to a particular *brand* of product. Claim 1 broadly recites a "BIOS of a computer," not "BIOS of an IBM computer" as argued by Apple. *Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves . . . to define the scope of the patented invention.").

The '941 Patent does not mention an "IBM PC" or any computer brand for that matter. On the contrary, the '941 Patent expressly defines the claim term "computer" broadly: "[i]n the context of the present invention, a 'computer' relates to a digital data processor." (Rondini Decl. ¶2, Ex. 1, '941 Patent, 3:18-19.) Why would the inventors have wanted to limit the scope of their invention to a particular *brand* of computer? On the contrary, during examination, ***the inventors made clear that: "all computers must have a BIOS."*** (Rondini Decl. ¶3, Ex. 2, 2/5/2002 Amendment, p. 7, ANCA 715, emphasis added.) Nowhere in the intrinsic evidence are there any indications of limiting the claims to an IBM computer, let alone a clear and unmistakable disavowal of claim scope as is required for such a draconian construction. *Thorner,* 669 F.3d at 1366.

Apple presents an expert declaration that contradicts the intrinsic evidence and, therefore, it should not be considered. *Vitronics*, 90 F.3d at 1583. John Kelly states: "The term 'BIOS' was specific to IBM PCs or compatibles and was not associated with computers that were not IBM PCs." (Rondini Decl. ¶7, Ex. 6 at ¶ 32.) Not only is this statement legally irrelevant, it is incorrect.

**Non-IBM** computers (both before and after the '941 Patent was filed) included "BIOS." Long before IBM computers, for example, the Commodore 64 computer had "BIOS." (Rondini Decl. ¶10, Ex. 9, 1983 Commodore 64 User's Guide: Section 6.3: "The BIOS Programs," ANCA 1610-1613.) Apple documents from the mid-1990's confirm that Apple's "Macintosh" brand of

computers also included "BIOS."  (Rondini Decl. ¶11, Ex. 10, 1995 Apple Macintosh User Guide, p. 43 (ANCA 2716): "area in the BIOS", "ROM BIOS," p. 66 (ANCA 2739): "system BIOS," p. 119: (ANCA2792) "BIOS calls.")  Apple further attempted to license its "Mac ROM BIOS" to third parties during the 1990's.  (Rondini Decl. ¶12, Ex. 11, Info World, ANCA 2214-2215.)

Apple's patent applications illustrate that the iPhone (Rondini Decl. ¶13, Ex. 12, Fig. 5, ANCA 2879), Apple laptops (*Id.*, Ex. 12, Fig. 3, ANCA 2877) and desktops (*Id.*, Ex. 12, Fig. 4, ANCA 2878) ***all include BIOS***.  (*See, e.g., Id.,* Ex. 12, U.S. Patent Publication No. 2011/0090380, ¶70 and ¶80, ANCA 2925-2926.)  As explained in the application:  "the memory **18** may store firmware for the electronic device **10**, ***such as a basic input/output system (BIOS)***."  (*Id.* at ¶80 ANCA 2926; emphasis added.)  Despite Apple's contention that "BIOS" is only used on an "IBM PC," Apple's own real world evidence proves otherwise.  This objective evidence confirms the fact that persons of ordinary skill in the art do not interpret the term "BIOS" as being limited to "IBM PC compatible computers."

As explained by Ancora's expert, Mr. Jestice:

> I understand that Apple contends that BIOS is only present in "IBM" computers, presumably to exclude "Apple" computers.  That is not correct because virtually all computers have BIOS.  Any computer that does not include BIOS would require the user to manually input the system initialization parameters described above at start-up.  I am not aware of any computer available for retail sale today, or in 1998 when the '941 application was filed, that requires manual initialization.  This is because they all include BIOS which performs the initialization steps automatically at start-up.

(Rondini Decl. ¶6, Ex. 5 at ¶ 13.)

Apple's expert testified that, in reaching his conclusion that BIOS was limited to "IBM" computers, he did not consider computers having BIOS that were in existence *before* the application for the '941 patent was filed.  (Rondini Decl. ¶9, Ex. 8, Kelly Dep. Tr. at p. 62, line 18 – p. 67, line 5.)  Why not?  He never undertook an investigation to determine whether the meaning of BIOS has changed.  (*Id.* at p. 65, line 8 – p. 67, line 5.)  This head-in-the-sand approach to claim construction is improper.  Apple's expert was only able to distinguish these

other types of computers with BIOS on the basis that they were not "IBM" computers.  (*Id.*)  In other words, he injected the unclaimed "IBM" limitation into claim 1, and then used that injected limitation as his sole basis for distinguishing non-IBM computers that indisputably contained BIOS.  This circular analysis confirms that Apple's self-serving "IBM" limitation is completely unfounded.

In addition to limiting the claims to PCs branded by IBM, Apple also seeks to add the unclaimed limitation that the BIOS handle transfer of data among "peripheral" devices.  This is another improper attempt to narrow claim 1.  Claim 1 and the '941 Patent do not even mention "peripheral" devices, let alone require that the BIOS handle data communication with them. Apple simply replaces the Examiners' broader "hardware" language in the prosecution history with the narrower term "peripheral."  Apple's construction is contrary to most principles of claim construction.  (*See infra*, Section II.)  Apple's proposed construction is improper because it does not even cover the preferred embodiment disclosed in the '941 Patent (it makes no mention of "peripheral" devices).  *Primos, Inc. v. Hunter's Specialties, Inc.,* 451 F.3d 841, 848 (Fed. Cir. 2006) (A construction that excludes an embodiment is improper.).

## C.   "Program"

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| "Program" | No construction necessary.  If construed:  A set of instructions that can be executed by a computer. | software application that interacts with and relies on the operating system |

This term first appears in the following phrase of claim 1 of the '941 patent: "selecting a program residing in the volatile memory."  Program is a commonly understood term and requires no construction.  *Finjan*, 626 F.3d 15 1207 (holding rejection of defendant's construction and that ordinary meaning applies is appropriate).

1    Defendant's construction of these terms is entirely motivated by its search for an

2    infringement defense.  Every person of skill in the computer field knows that a "program" is:  "a

3    set of instructions that can be executed by a computer."   The '941 Patent uses the term

4    "program" broadly to include "software"  (Rondini Decl. ¶2, Ex. 1, '941 patent, col. 1, line 8,

5    col. 1, line 13, col. 4, line 42)  or an "application"  (*Id.,* Ex. 1, '941 patent, col. 1, lines 53-54,

6    col. 2, lines 29-30, col. 2, line 37, col. 2, lines 48-56, col. 3, line 40, col. 4, lines 44).   The

7    Microsoft Computer Dictionary defines the term "program" as "a sequence of instructions that

8    can be executed by a computer," and that the term "program" is "also called software." (Rondini

9    Decl. ¶8, Ex. 7, ANCA 2872.)  Even Apple documents define "program" similarly to Ancora's

10   proposal.  (Rondini Decl. ¶14, Ex. 13, ANCA 1386, Apple II Reference Manual: "Program: A

11   sequence of instructions which describes a process.")

12   In this litigation, however, Apple seeks to significantly narrow the scope of the claims.

13   By requiring that the claimed "program" "interact" with the "operating system," Apple seeks to

14   *exclude* the "operating system" itself from the scope of the term "program."  Nothing in the '941

15   Patent supports this exclusion.

16   An operating system, is undeniably a "program," *i.e.*, a "set of instructions that can be

17   executed by a computer."   The primary prior art reference over which the Patent Office allowed

18   '941 Patent expressly described an "operating system" as a type of "program." (Rondini Decl.

19   ¶15, Ex. 14, U.S. Patent No. 6,189,146, 5:63 – 6:5: "programs include a server operating

20   system.")  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 (Fed. Cir. 2007) (cited references

21   are part of the intrinsic record).

22   Apple attempts to dramatically narrow the claimed terms to a particular *type* of program –

23   another negative limitation that the claims, the intrinsic record and the law simply do not permit.

24   The specification does not clearly set forth Apple's far narrower definition.  *Thorner,* F.3d at

25   1365.  Similarly, there was no clear disavowal of claim scope in the prosecution history.  *Id.* at

26   1366.  Again, outside of this litigation, Apple agrees with Ancora.  In its own patents, Apple

27

28

explains:   "An operating system 180 is a program that controls processing by CPU 110."
(Rondini Decl. ¶16, Ex. 15, U.S. Patent 6,178,464 at 3:34-35).


**D.   "Volatile Memory"**

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| "volatile memory" | memory that is not maintained when the power is removed | This phrase is indefinite under 35 U.S.C. § 112, ¶ 2. |

This term first appears in the following phrase of claim 1 of the '941 patent: "selecting a program residing in the volatile memory."   Apple contends that this term is indefinite.   Apple, therefore, must prove by clear and convincing evidence that the term cannot be construed. *Datamize,* 417 F.3d at 1348; *Source Search Techs., LLC v. LendingTree, LLC,* 588 F.3d at 1076 ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. Only claims not amenable to construction or insolubly ambiguous are indefinite.").   Because the term "volatile memory" is very well-known and readily amendable to construction, it is not indefinite.

The term is universally understood by those of skill in the art as memory that is not available for use by a program after the computer's power turned off.   Both Ancora's and Apple's experts agree.

| Ancora Expert (Ex. 5, Jestice Decl., ¶ 5) | Apple Expert (Ex. 6, Kelly Decl. ¶ 23.) |
|---|---|
| "[I]nformation stored in 'volatile' memory is not preserved for use after the power is removed." | "The ordinary meaning of volatile memory' is memory that loses its data when power is removed" |

Volatile memory is a fundamental building block of all computers.   Virtually every computer dictionary and textbook defines the term "volatile memory."   For example, the Microsoft Computer Dictionary defines the term as "[m]emory, such as RAM, that loses its data when the power is shut off. *Compare* nonvolatile memory.")   (Rondini Decl. ¶8, Ex. 7, <u>The</u>

Microsoft Computer Dictionary (1998), ANCA 2874.)  Apple also has 700 issued U.S. Patents that use the term "volatile memory."  (Rondini Decl. ¶18, Ex. 17.)

Because the term "volatile memory" is well understood by those of skill in the art (including by Apple and its expert), it is amenable to construction and, therefore, is not indefinite.  That ends the claim construction and definiteness analysis.  *Source Search Techs., LLC v. LendingTree, LLC,* 588 F.3d at 1076.

It is unclear on what basis Apple contends that the term as used in claim 1 is indefinite.  Neither Apple nor its expert have ever identified a problem with claim 1 *as written*.  Apple's expert takes issue with an *example* in the '941 *specification* (not limitations of claim 1) disclosing that volatile memory could take the form of a "hard disk."  (Rondini Decl. ¶7, Ex. 6, Kelly Decl., ¶24.)  Apple's expert does not, however, have an objection to other examples in the specification stating that volatile memory can take the form of "RAM."  (Rondini Decl. ¶2, Ex. 1, '941 Patent, 5:15-16, 4:52-54.)  He agrees that RAM is a form of volatile memory.  (Rondini Decl. ¶9, Ex. 8, Kelly Dep. Tr. at p. 122, lines 16-18.)

The *form* of the volatile memory (*e.g.* "RAM" or "hard disk") is not recited in claim 1.  Thus, the RAM/hard-disk distinction raised by Apple's expert is a red herring to the claim construction analysis.  *Phillips,* 415 F.3d at 1315-16, 1320, 1323 ([A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Markman,* 52 F.3d at 980 ("The written description part of the specification does not delimit the right to exclude.  That is the function and purpose of the claims.").  Moreover, "the Federal Circuit has cautioned against imposing such structural limitations into a method claim when those limitations are not included in the language of the claim."  *Fujitsu Ltd. v. Tellabs Operations, Inc.,* 821 F.Supp.2d 1009, 1048 (Fed. Cir. 2011).

Nonetheless, the '941 Patent expressly states that volatile memory may take the form of "RAM" or "hard disk."

a volatile memory area (6) (e.g. the internal RAM memory of the computer)

the volatile memory is a RAM e.g. hard disk and/or internal memory of the computer

(Rondini Decl. ¶2, Ex. 1, '941 Patent, 5:15-16, 4:52-54.)

Apple's expert confirmed that the '941 Patent does not set forth a "special meaning" or definition for the term "non-volatile memory." (Rondini Decl. ¶9, Ex. 8, Kelly Dep. Tr. at p. 77, line 20 – p. 78, line 2.) This further halts any indefiniteness argument. *Exxon Research*, 265 F.3d at 1375.

As Apple's expert admitted, program data intended for RAM (i.e., undisputed "volatile" memory) is routinely stored on the "hard disk" when two programs attempt to write data to the same location in RAM:

> Q:   If two programs are competing for the same address space in RAM, the data for one of the applications will be written to the swap file space on the hard disk; correct?
>
> [OBJECTIONS OMITTED]
>
> A:   I think it's fair to say that two applications are running and it happens that they are both using virtual addresses, maybe different virtual addresses, that have been mapped to the same  physical page, the same physical address range in memory, then they both won't be able to access the memory at the same time. It may be that – there may be neither of them maybe in the – have been written out to disk, one of them may be have written out to disk or both of them might have been written out to disk. Those are all possibilities in that circumstance.

(Rondini Decl. ¶9, Ex. 8, Kelly Dep. Tr. at p. 121, line 18 – p. 122, line 9.)

Ancora's expert agrees with the understanding of Apple's expert that virtual memory may take the form of a hard disk to supplement RAM when necessary:

> Volatile memory can take several physical forms. For example, Random Access Memory or "RAM" is often considered "volatile" memory because information stored in RAM is automatically lost when power is removed. Other physical forms of memory are also commonly used as volatile memory, however, such as "flash" and "hard disk" or "hard drive." Due to the historically higher price of RAM storage in comparison to the price of hard drive storage (certainly at the time the '941 application was filed in 1998), available space on the hard was often used while the computer was running to supplement the volatile storage space available in RAM. This supplemental storage is common and is often referred to as "virtual" memory. Information stored in virtual memory, like information

stored in RAM is not preserved for use after power is removed, i.e., the computer is turned off.

The '941 patent recognizes that volatile memory can be stored in either "RAM" or "hard disk." ('941 patent, 4:52-54; 5:15-16.) This is consistent with the understanding of persons of ordinary skill in the art explained above.

(Rondini Decl. ¶6, Ex. 5, Jestice Decl., ¶¶7-8.)

Thus, even if claim 1 required a physical *form* of volatile memory it is entirely appropriate to consider a "hard disk" and "RAM" as appropriate forms. Because claim 1 does not require a particular structure for the claimed virtual memory, however, the structure disclosed in the '941 specification is irrelevant to the claim construction analysis.

**E.    "License Record"**

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| "license record" | No construction necessary<br><br>If construed:<br>information for verifying a licensed program | record from the licensed program that identifies the licensed program and the number of licensed users |

This term first appears in the following phrase of claim 1 of the '941 Patent: "the verification structure accommodating data that includes at least one license record." License record is a commonly understood term and requires <u>no construction</u>. *Finjan*, 626 F.3d 15 1207 (holding rejection of defendant's construction and that ordinary meaning applies is appropriate).

As used in the context of the '941 Patent, a "license record" is the data or information used to verify a licensed program. The license record is stored within the "verification structure" located in the BIOS, and it is used in a "verification" process to determine whether the claimed program is permitted to run on the computer.

The '941 Patent provides several detailed examples of the sort of information a license record may include. For example, the license record may include an "author name, program name and number of licensed users." (Rondini Decl. ¶2, Ex. 1, '941 Patent, 1:55-58.) The program name and number of licensed users is expressly described as just an "example" of the

type of information contained in the license record. (*Id.*, Ex. 1, 5:29-34: "By way of example . . .".) In another example, the specification states "[t]he actual format of the license may include a string of terms that correspond to a license registration entry (e.g. lookup table entry or entries) at the license registration bureau." (*Id.,* Ex. 1, 2:5-8.) In a statement having particular relevance to the claim construction dispute, the '941 patent describes the composition of the license record broadly:

> In principle, the manufacturer of the licensed-software-program may specify the license-record format and therefore <u>different formats may, if desired, be used for respective applications</u>.

(*Id.*, Ex. 1, 4:41-44, underlining added.)

Directly contrary to this plain statement, the defendants' proposed construction seeks to limit the format of the license record to one that "identifies the licensed program and the number of licensed users." As a threshold matter, claim 1 makes no reference whatsoever to "identifying the licensed program or the number of license users." These limitations are technical details taken directly from examples provided in the written description. Defendant's gambit is contrary to more than 100 years of Supreme Court patent jurisprudence. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248-1249 (Fed. Cir. 1998), *citing McCarty v. Lehigh Val R.R.*, 160 U.S. 110, 116, 16 S.Ct. 240 (1895) ("[W]e know of no principle of law which would authorize us to read into a claim an element which is not present . . . The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop."). The specification does not limit claims, but is instead statutorily required "to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d 1323.

A closer look at Apple's proposed construction illustrates how Apple inserts 15 words for the word "license" in the claim while maintaining the word "record" in its proposed construction.

| Claim Language | Apple Proposed Construction |
|---|---|
| *license* record | record *from the licensed program that identifies the licensed program and the number of licensed users* |

This blatant attempt to rewrite the claim is further evidence that <u>no construction is necessary</u>. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

Apple's attempt to inject arbitrary and unclaimed limitations as a "construction" of the claim language as written should be rejected.

## F. "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS"

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| "verifying the program using at least the verification structure" | No construction necessary.<br><br>If construed:<br>confirming whether a program is licensed using at least the verification structure | Confirming whether the program is licensed by comparing the license record extracted from the program to the license record in the verification structure |

This term appears as a separate element in the claimed method in claim 1 of the '941 Patent. Again, there is no reason to construe this claim term. These are commonly understood words and phrases, no construction is required. *Finjan*, 626 F.3d at 1207.

The primary dispute is that Apple seeks to narrow the broad phrase "using at least the verification structure" to the far narrower phrase "comparing the license record extracted from the program to the license record." There is no basis for narrowing the claim in the manner sought by Apple.

Apple's construction is presumptively improper because the details Apple seeks to inject into claim 1 are recited in dependent claim 9: "comparing the encrypted licenses-software-program's license-record contents with the encrypted license-record." (Rondini Decl. ¶2, Ex. 1, '941 Patent, 7:56-58.) This gives rise to the presumption that these limitations are <u>not</u> required in claim 1. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-1315 (Fed. Cir. 2005) (*en banc*) ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that

the limitation in question is not present in the independent claim"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

The presumption is further supported by the fact that the '941 specification describes multiple examples of techniques for verifying the program using the verification structure.  For example, the specification discloses that "verifying" includes determining whether a particular program is "compatible" with the license record.  (Rondini Decl. ¶2, Ex. 1, '941 Patent, 3:38-41.) A "comparison" is not required for this "compatibility" verification.  Apple seeks to limit the claim to a different example in which a comparison is done to perform the verification. However, the patent expressly states "[t]he example above is given for clarity of explanation only and is by no means binding."  (*Id.,* Ex. 1, '941 Patent, 2:60-61.)

"Comparing" is not the ordinary meaning of "using."  In fact, "using" requires no construction as proposed by Ancora.  *Finjan*, 626 F.3d at 1207; *Phillips,* 415 F.3d at 1314 ("the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words.").

Once again, Apple is attempting to limit the claims to one example provided in the specification, and the exclusion of others.  Such a "construction" is improper.  *Thorner,* F.3d at 1365-66.

## G.    Apple's "Ordering" Argument

| Claim Term/Phrase | Ancora Construction | Apple Construction |
|---|---|---|
| All Asserted Claims | The claim is not limited to the performance of the steps in the order recited. | The steps in each asserted claim must be performed in the order recited. |

Finally, Apple seeks to require that the claimed steps be performed in the order recited in order to infringe.  This position is contrary to Federal Circuit law and also contrary to the specification of the '941 Patent.  "[A]lthough a method claim necessarily recites the steps of the

method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic System v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). Here, there is no required order of the method steps of the '941 Patent, claim 1.

The key elements at issue are the following **bolded elements**.
1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
> ***selecting a program residing in the volatile memory,***
> ***using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,***
> verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
> acting on the program according to the verification.

The claims do not require that the "selecting" step be performed before the "using an agent to set up" step. Indeed, by this argument, Apple seeks a construction contrary to the express teachings of the '941 Patent and, therefore, is incorrect. The specification states that the first step performed is setting up the verification structure.

> Now, there commences an initial license establishment procedure, where ***a verification structure is set in the BIOS*** so as to indicate that the specified program is licensed to run on the specified computer. This is implemented by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) as an encryption key.

(Rondini Decl. ¶2, Ex. 1, '941 Patent, 1:59-65, emphasis added.) Then, only after the verification is "set in the BIOS" can the verification process commence, which includes the loading of the program.

> ***Having placed the encrypted license record in the second non-volatile memory*** (e.g. the E2PROM), the process of verifying a license may be commenced. Thus, ***when a program is loaded into the memory of the computer***, a so called license verifier application, that is a priori running in the computer, accesses the program under question, retrieves therefrom the license record, encrypts the record utilizing the specified unique key (as retrieved from the ROM section of the

1    BIOS) and compares the so encrypted record to the encrypted records that reside
     in the E2PROM.
2

3    (*Id.*, Ex. 1, '941 Patent, 2:10-19, emphasis added.)  And repeatedly, the specification states that

4    the order of the preferred embodiment is not limiting:  (*Id.*, Ex. 1, '941 Patent, 5:43-45:  "In a

5    typical, yet not exclusive sequence of operation . . . .")  Simply, Apple seeks to import the order

6    of a single embodiment of the specification (Figure 2) into the claims, and at the same time

7    expressly exclude other disclosed embodiments.  *Primos, Inc. v. Hunter's Specialties, Inc.,* 451

8    F.3d 841, 848 (Fed. Cir. 2006) (A construction that excludes an embodiment is improper.)  And,

9    even if there was only one embodiment described in the specification, limiting the claims to that

10   embodiment is still improper.  *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.,*

11   540 F.3d 1337, 1345 (Fed. Cir. 2008) ("[W]e have repeatedly held that the fact that the

12   specification describes only a single embodiment, standing alone, is insufficient to limit

13   otherwise broad claim language.").

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.  CONCLUSION

For the reasons set forth above, Ancora requests that if the Court determines that claim construction is necessary, the Court adopt Ancora's proposed constructions.  Ancora's proposed constructions are reproduced below for the Court's convenience:

| Claim Term | Ancora's Construction |
|---|---|
| "non-volatile memory" | memory that is maintained when the power is removed |
| "BIOS" | software routines that handle startup operations |
| "Program" | No construction necessary.<br><br>If construed:<br><br>A set of instructions that can be executed by a computer. |
| "volatile memory" | memory that is not maintained when the power is removed |
| "license record" | No construction necessary.<br><br>If construed:<br><br>information for verifying a licensed program |
| "verifying the program using at least the verification structure: | No construction necessary.<br><br>If construed:<br><br>confirming whether a program is licensed using at least the verification structure |
| All Asserted Claims | The claim is not limited to the performance of the steps in the order recited. |

Dated:  May 9, 2012

Respectfully submitted,

**BROOKS KUSHMAN P.C.**


By:_/s/ John S. LeRoy_____
Mark A. Cantor (*Pro Hac Vice*)
mcantor@brookskushman.com
John S. LeRoy (*Pro Hac Vice*)
jleroy@brookskushman.com
Marc Lorelli (*Pro Hac Vice*)
mlorelli@brookskushman.com
John P. Rondini (*Pro Hac Vice*)
jrondini@brookskushman.com
1000 Town Center, Twenty-Second Floor
Southfield, MI 48075
Tel: (248) 358-4400 -- Fax: (248) 358-3351

William E. Thomson, Jr. (SBN 47195)
wthomson@brookskushman.com
601 S. Figueroa St., Suite 2080
Los Angeles, CA 90017-5726
Tel: (213) 622-3003 -- Fax: (213) 622-3053

*Attorneys for Ancora Technologies, Inc.*

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on <u>May 9, 2012</u>, I electronically filed the foregoing document with the Clerk of the Court for the Northern District of California using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:. Michael A. Jacobs, Richard S.J. Hung, Eric W. Ow, Francis C. Ho, Bita Rahebi.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System:   NONE.


By:  /s/ John S. LeRoy
Mark A. Cantor (*Pro Hac Vice*)
mcantor@brookskushman.com
John S. LeRoy (*Pro Hac Vice*)
jleroy@brookskushman.com
Marc Lorelli (*Pro Hac Vice*)
mlorelli@brookskushman.com
John P. Rondini (*Pro Hac Vice*)
jrondini@brookskushman.com
1000 Town Center, Twenty-Second Floor
Southfield, MI 48075
Tel: (248) 358-4400 -- Fax: (248) 358-3351

*Attorneys for Ancora Technologies, Inc.*