1  MICHAEL A. JACOBS (CA SBN 111664)
   mjacobs@mofo.com
2  RICHARD S.J. HUNG (CA SBN 197425)
   rhung@mofo.com
3  FRANCIS C. HO (CA SBN 247426)
   fho@mofo.com
4  ERIC W. OW (CA SBN 252921)
   eow@mofo.com
5  MORRISON & FOERSTER LLP
6  425 Market Street
   San Francisco, CA  94105-2482
7  Telephone: (415) 268-7000
   Facsimile: (415) 268-7522
8
9  BITA RAHEBI (CA SBN 209351)
   brahebi@mofo.com
10 MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
11 Los Angeles, CA  90013-1024
   Telephone: (213) 892-5200
12 Facsimile: (213) 892-5454
13

14 *Attorneys for Defendant and Counterclaim Plaintiff*
   *Apple Inc.*

15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANCORA TECHNOLOGIES, INC.,<br><br>         Plaintiff,<br><br>    v.<br><br>APPLE INC.,<br><br>         Defendant. | Case No. CV 11-06357-YGR<br><br>**APPLE INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| APPLE INC.,<br><br>      Counterclaim Plaintiff,<br><br>v.<br><br>ANCORA TECHNOLOGIES, INC.,<br><br>      Counterclaim Defendant. | |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ........................................................................................................ 1
II.  '941 PATENT .......................................................................................................... 2
III. GOVERNING LAW ................................................................................................. 4
     A.   Principles of Claim Construction ................................................................... 4
     B.   Indefiniteness Under 35 U.S.C. § 112 ¶ 2 ..................................................... 5
IV.  CLAIM TERMS AND PHRASES .......................................................................... 6
     A.   "Volatile Memory" and "Non-Volatile Memory"—Claims 1-3, 5-17 .................. 6
     B.   "BIOS"—Claims 1-3, 5-17 ............................................................................. 13
     C.   "program"—Claims 1-3, 5-17 ........................................................................ 18
     D.   "license record"—Claims 1-3, 5-17 ............................................................... 21
     E.   "verifying the program using at least the verification structure" —Claims
          1-3, 5-17 ......................................................................................................... 22
V.   CLAIM STEPS MUST BE PERFORMED IN ORDER RECITED ............................... 23
VI.  CONCLUSION ....................................................................................................... 25

la-1169876

CASES

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
  616 F.3d 1283 (Fed. Cir. 2010)................................................................. 10

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002)............................................................. 10, 11

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006)............................................................... 22

*Biogen Inc. v. Berlex Labs., Inc.*,
  318 F.3d 1132 (Fed. Cir. 2003)............................................................. 16

*Cephalon, Inc. v. Barr Labs., Inc.*,
  389 F. Supp. 2d 602 (D. Del. 2005) ......................................................... 5

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004)............................................................... 6

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)............................................................... 9

*Datamize, LLC v. Plumtree Software, Inc.*,
  No C 02-5693 VRW, 2004 U.S. Dist. LEXIS 28382 (N.D. Cal. July 9, 2004)...................... 17

*Halliburton Energy Servs. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)........................................................... 5, 6, 9

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008)............................................................. 22

*Honeywell Int'l, Inc. v. ITC*,
  341 F.3d 1332 (Fed. Cir. 2003)............................................................. 6, 9

*Kopykake Enters. v. Lucks Co.*,
  264 F.3d 1377 (Fed. Cir. 2001)............................................................. 16

*Loral Fairchild Corp. v. Sony Elecs. Corp.*,
  181 F.3d 1313 (Fed. Cir. 1999)............................................................. 23

*Mantech Envtl. Corp. v. Hudson Envtl. Servs.*,
  152 F.3d 1368 (Fed. Cir. 1998)............................................................. 23

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
  672 F.3d 1350 (Fed. Cir. 2012)............................................................... 4

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ................................... 4, 5

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ........................................................................................ 22

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   No. C 08-04990 JW, 2012 U.S. Dist. LEXIS 65858 (May 10, 2012) ................................... 24

*Nystrom v. Trex Co.*,
   424 F.3d 1136 (Fed. Cir. 2005) ...................................................................................... 5, 20

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
   448 F.3d 1309 (Fed. Cir. 2006) ........................................................................................ 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................................... passim

*Rambus Inc. v. Hynix Semiconductor, Inc.*,
   569 F. Supp. 2d 946 (N.D. Cal. 2008) .............................................................................. 11

*Shering Corp. v. Amgen Inc*,
   222 F.3d 1347 (Fed. Cir. 2000) ........................................................................................ 16

*Source Search Techs., LLC v. LendingTree, LLC*,
   588 F.3d 1063 (Fed. Cir. 2009) ........................................................................................ 20

**STATUTES**

35 U.S.C. § 112 ¶ 2 ............................................................................................................. 5

**OTHER AUTHORITIES**

37 C.F.R 1.121(f) ............................................................................................................... 16

# I.    INTRODUCTION

Ancora's willful blindness to the specification of the asserted patent belies the elemental precept of patent law that claim construction is not performed in a vacuum. The core principles of claim construction are beyond dispute. The Court must view the claims of a patent in the context of the specification, and the construction may be informed by the applicants' representations to the Patent & Trademark Office during prosecution. The Court must construe terms not by what they mean today, but by what they meant at the time of the filing of the application. And where appropriate, the Court may look to extrinsic evidence—including technical dictionaries and expert opinions—to assist with the construction of a term. Apple's constructions of terms in United States Patent No. 6,411,941 ("the '941 patent") adhere to these principles: they are supported by the language of the claims, the specification, the file history, and, where it is appropriate, the extrinsic evidence.

For its part, Ancora does its best to ignore these guiding principles. Throughout its brief, Ancora repeatedly and persistently asks the Court to disregard the patentee's own explanation of the claimed invention, and instead evaluate individual words from the claims in isolation. Ancora's request that the Court skip past the six columns of text that precede the claims and consider individual claim terms out-of-context is contrary to law. Ancora likewise asks the Court to overlook the '941 patent prosecution history where it finds that history inconvenient. Finally, where the '941 patent fails to provide guidance on the meaning of claim terms, Ancora attempts to distract the Court from evidence of what those terms meant to people of ordinary skill in the field at the time of the application for the '941 patent.

For example, although the patent specification repeatedly states that hard disks are volatile memory—which renders both of the terms "volatile memory" and "non-volatile memory" indefinite because it creates an unresolvable ambiguity as to what *characteristics* render the memory volatile versus non-volatile—Ancora proposes that the Court ignore the specification and construe the claims in isolation. Ancora seemingly takes this tack because Ancora itself cannot reconcile its proposed construction of "volatile memory" as "memory that is not maintained when the power is removed" with the '941 patent's specification, which identifies a "hard disk"—

which is memory that *is* maintained when the power is removed—as a type of volatile memory. Indeed, the named inventor of the '941 patent and Ancora's own expert disagree not only with how the '941 patent specification uses the terms volatile and non-volatile, but they even disagree with each other.

In addition to its rejection of the '941 patent specification, Ancora also asks the Court to ignore Ancora's own favored dictionary's definition of the term "BIOS." The claims and specification of the '941 patent refer to "BIOS"—an acronym for Basic Input/Output System— without elaboration. Here, where the specification is silent as to the meaning of "BIOS," extrinsic evidence of the meaning of that term to a person of ordinary skill at the time of the application for the '941 patent informs its meaning in the patent claims. One of ordinary skill in the art in 1998 would have understood "BIOS" to apply to the IBM PC-compatible computer platform. Ancora bristles at such a construction and suggests that Apple is inserting a "brand" name into the construction. But even the very dictionary that *Ancora* has asked this Court to rely on in the construction of *other* terms defines BIOS as specific to IBM PC-compatibles, as do numerous other technical dictionaries at the relevant time.

Ancora also asks the Court to adopt a construction of "program" that is divorced from the specification and the file history, which use the term to refer to applications, not the operating system those applications run on. But Ancora cannot present its invention narrowly in the specification and argue it narrowly during prosecution to overcome a rejection, and then ask for a broader construction in this litigation.

## II. '941 PATENT

The '941 patent is entitled "Method of Restricting Software Operation Within a License Limitation." The patent is directed to preventing the unauthorized use of computer programs, *e.g.,* by hackers who copy software applications and run them on unauthorized computers.

The "Background of the Invention" discusses prior efforts to prevent such unauthorized use, including the writing of a license signature onto the computer's "volatile" memory. The patent indicates that this method is problematic because it is vulnerable to attack by hackers. (*See* Declaration of Bita Rahebi ("Rahebi Decl.") Ex. A ('941 patent, 1:19-24).) The patent purports

to overcome such problems by relying on the use of *non*-volatile memory (as opposed to volatile memory). According to the "Summary of the Invention," the method "strongly relies on the use of a key and of a record, which have been written into the non-volatile memory of a computer." (*Id*. at 1:39-42.) Each application that is to be licensed to run on a specified computer is associated with a license record that consists of author name, program name, and the number of licensed users. (*Id*. at 1:53-57.) During an initial license establishment procedure, a verification structure is set up in a non-volatile memory area of the computer—the memory area associated with the "BIOS" of the computer. (*Id*. at 1:59-62.) The procedure involves extracting a license record from the application to be run and encrypting it using a unique key embedded in a first non-volatile area of the ROM that stores the BIOS, and storing the encrypted license record in a second non-volatile memory area associated with the BIOS. (*Id*. at 1:65-2:1.)

The process of verifying a license for running on a particular computer occurs subsequently through the use of encryption. When a program is loaded, a license verifier application retrieves the license record from the program, encrypts the record, and then compares that record to the encrypted license record stored in the non-volatile memory area associated with the BIOS.[1] (*Id*. at 2:10-20.) If they match, the program is licensed and verified to run. (*Id*. at 2:19-20.) This operation is illustrated by reference to an attempt by a hacker to run an application (Lotus 123 in the example) on an unverified computer. (*Id*. at 2:27-59.)

The "Summary of the Invention" emphasizes the benefits of using non-volatile memory rather than volatile memory: "[a]n important advantage in utilizing non-volatile memory such as that residing in the BIOS is that the required level of system programming expertise that is necessary to intercept or modify commands, interacting with the BIOS, is substantially higher than those needed for tampering with data residing in volatile memory such as hard disk." (*Id*. at 3:4-9.)

---

[1] Alternatively, the license record extracted from the program is not encrypted; instead, the encrypted license record stored in the memory area associated with the BIOS is decrypted, and the license record contents from the program are compared against the decrypted license record contents from the verification structure. (*Id*. at 6:29-39.)

Claim 1, which is the only asserted independent claim, recites the following:

> A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
>
> selecting a program residing in the volatile memory,
>
> using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
>
> acting on the program according to the verification.

('941 patent, claim 1.)

## III. GOVERNING LAW

### A. Principles of Claim Construction

Claim construction is a matter of law for the Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 391 (1996). As the Federal Circuit explained in its *en banc* seminal decision on claim construction, a claim term is interpreted according to how it would have been understood by a person of ordinary skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Claim construction requires considering "'the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* at 1314.

The specification "is always highly relevant to the claim construction analysis." *Id.* at 1315. Contrary to Ancora's suggestion, the specification must be consulted even if there is no express definition: "[a]ssigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term,' and that the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms *by implication*.'" *Id.* at 1320-21 (emphasis added); *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (same). Importantly, a patentee is "not

1  entitled to a claim construction divorced from the context of the written description." *Nystrom v.*

2  *Trex Co*., 424 F.3d 1136, 1143-45 (Fed. Cir. 2005).

3      Likewise, "the prosecution history can often inform the meaning of the claim language by

4  demonstrating how the inventor understood the invention and whether the inventor limited the

5  invention in the course of prosecution, making the claim scope narrower than it would otherwise

6  be." *Phillips*, 415 F.3d 1303 at 1317. In *Nystrom v. Trex Co*., 424 F.3d at 1144, the Court found

7  the narrowing language in the prosecution history to be consistent with the specification and

8  limited the claim term accordingly. The Court found it unnecessary to determine whether there

9  was a disclaimer, given that the specification and file history were consistent. *Id*.; *see also*

10 *Cephalon, Inc. v. Barr Labs., Inc*., 389 F. Supp. 2d 602 (D. Del. 2005) (refusing to adopt plain

11 and ordinary meaning in light of narrow use in specification and file history even though no

12 disclaimer).

13     Dictionaries are among a class of extrinsic evidence that has been called "useful in claim

14 construction," especially "if the court deems [them] helpful in determining 'the true meaning of

15 language used in the patent claims.'" *Phillips*, 415 F.3d 1303 at 1318 (quoting *Markman*, 52 F.3d

16 at 980). Finally, expert testimony can be useful for a "variety of purposes," including

17 "establish[ing] that a particular term in the patent or the prior art has a particular meaning in the

18 pertinent field." *Id*.

19     **B.    Indefiniteness Under 35 U.S.C. § 112 ¶ 2**

20     Patent claims must "particularly point[] out and distinctly claim[] the subject matter which

21 the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The Federal Circuit has stated that

22 "[b]ecause the claims delineate the patentee's right to exclude, the patent statute requires that the

23 scope of the claims be sufficiently definite to inform the public of the bounds of the protected

24 invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent." *Halliburton*

25 *Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (further observing that

26 "[o]therwise, competitors cannot avoid infringement, defeating the public notice function of

27 patent claims") (citation omitted).

28

A claim is indefinite if it is "not amenable to construction" or is "insolubly ambiguous." *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (holding claims indefinite because "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention"). "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251. Moreover, "courts may not redraft patent claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

## IV. CLAIM TERMS AND PHRASES

### A. "Volatile Memory" and "Non-Volatile Memory"—Claims 1-3, 5-17

| Term | Apple's Proposal | Plaintiff's Amended Construction |
|------|------------------|--------------------------------|
| "volatile memory" | These terms are indefinite under 35 U.S.C. § 112, ¶ 2. | memory that is not maintained when the power is removed |
| "non-volatile memory" | These terms are indefinite under 35 U.S.C. § 112, ¶ 2. | memory that is maintained when the power is removed |

The claim terms "volatile memory" and "non-volatile memory" are indefinite because the patent specification identifies a "hard disk" as "volatile memory." This, in turn, creates an insoluable ambiguity as to what characteristics render a memory volatile or non-volatile. This ambiguity is confirmed by Ancora's own expert and the named inventor—even they cannot agree on whether a hard disk is volatile memory or non-volatile memory under the claims.

The '941 patent is specifically directed to the asserted improvement achieved by the use of non-volatile memory rather than volatile memory to store license information required to determine if an application is authorized to run on a given computer. (*Id*. at 3:4-17.) Because of this, it is critical to understand the scope of these two opposed terms.[2]

---

[2] Ancora seeks to isolate these terms by discussing them in two different sections of its brief. Apple orders its presentation of these terms consistent with the Court's Standing Order, which requires that the terms be addressed in sequential order as they are in the Joint Claim Chart. (Dkt. 67-1; Standing Order ¶ 5.)

Claim 1 calls out two different types of memory—volatile and non-volatile (*i.e.*, *not volatile*). The plain and ordinary meaning of the terms is not in dispute. To one of ordinary skill in the art, a volatile memory is memory whose data is *not* maintained when the power is removed and a non-volatile memory is memory whose data *is* maintained when the power is removed. (Rahebi Decl. Ex. B (Kelly Decl. ¶ 23); Rondini Decl. Ex. 5 (Jestice Decl. at ¶ 5).) Notwithstanding this ordinary meaning, the specification explicitly states three times that a hard disk—the archetypal example of memory that *maintains* its data when power is removed— is a "volatile memory":

- "Software based products have been developed to validate authorized software usage by writing a license signature onto the ***computer's volatile memory (e.g. hard disk***). These products may be appropriate for restricting honest software users, but they are very vulnerable to attack at the hands of skilled system's programmers (e.g. 'hackers')". ('941 patent at 1:19-24 (emphasis added).)

- "An important advantage in utilizing non-volatile memory such as that residing in the BIOS is that the required level of system programming expertise that is necessary to intercept or modify commands, interacting with the BIOS, is substantially higher than those needed for tampering with ***data residing in volatile memory such as hard disk***." (*Id.* at 3:4-9 (emphasis added).)

- "According to one, non-limiting, preferred embodiment of the present invention, the first non-volatile memory area is a ROM section of a BIOS; the second non-volatile memory area is a E²PROM section of a BIOS ***and the volatile memory is a RAM e.g. hard disk and/or internal memory of the computer***." (*Id.* at 4:49-54 (emphasis added).)

The patentee's express identification of a hard disk as volatile memory runs counter to the understanding of one of skill in the art. (Rahebi Decl. Ex. B (Kelly Decl. ¶ 24).) As known in the art, a hard disk does *not* lose its data when power is removed, and is therefore considered to be a *non*-volatile memory. (*Id.*) By stating that a hard disk is volatile memory, the patentee affected the meaning of both "volatile" and "non-volatile" by implication. *See Phillips*, 415 F.3d at 1321

("[t]he specification acts as a dictionary when it expressly defines terms used in the claims *or when it defines terms by implication.* Even when guidance is not provided in explicit definitional format, the specification may define claim terms *by implication* such that the meaning may be found in or ascertained by a reading of the patent documents.") (citations omitted) (emphasis added).

Because the patentee specifically identified a particular type of memory that is known in the art to be non-volatile as being volatile instead, it is impossible to determine the scope of the terms "volatile" and "non-volatile" as those terms are used in the '941 patent. (*Id.* at ¶ 25.) The specification does not illuminate what *characteristic* of a hard disk, or of any other type of memory for that matter, renders it volatile rather than non-volatile. Indeed, as illustrated by the '941 patent specification's unorthodox and undifferentiated equation of a "hard disk and/or internal memory of the computer" to "volatile memory" and "RAM" ('941 patent at 4:49-54), without identification of *any* criteria for distinguishing "volatile" and "non-volatile" memory renders those claim terms insolubly ambiguous, and therefore indefinite.

Even the named inventor and Ancora's expert cannot figure it out. During deposition in a prior action, inventor Miki Mullor testified that the disclosure in the '941patent of a hard disk as "volatile memory" should be disregarded, and that a hard disk is in reality a "non-volatile" memory:

> Q. You are telling me that notwithstanding this passage in Column 4 where a hard disk is described as being used as an example of volatile memory . . . – when the term volatile memory is used in the claim, it excludes a hard disk.
>
> A. Right.

(Rahebi Decl. Ex. C (Mullor Dep. 211:3-9).)

On the other hand, Ancora's expert Mr. Ian Jestice "guess[ed]" that, despite the unequivocal disclosure of a hard disk as volatile, a hard disk could be both non-volatile memory *and* volatile memory:

> Q. . . . So the competitor is looking at this claim, sir, in the context of claim 1, would a hard disk fall under volatile memory or nonvolatile memory?

A. So where are you suggesting in claim 1 there would be hard disk?

Q. I'm looking at the references to nonvolatile memory and volatile memory area, those references are in there, right, sir? I'm asking you if someone, a competitor has a computer with a hard disk and they're trying to figure out is their hard disk volatile memory or nonvolatile memory, what's the answer?

THE WITNESS: If I insert the word hard disk into nonvolatile, it makes no sense. Actually, it doesn't make any sense on volatile memory from what I can see. Hang on, let me continue all the way through.

*I guess you could conceivably use a hard disk in this context as nonvolatile and I guess volatile, depending on the actual application.*

(Rahebi Decl. Ex. D (Jestice Dep. 12:9-13:6) (objection omitted) (emphasis added).)

As evidenced by the confusion of the inventor and Ancora's expert, it is impossible for a competitor planning to design a product incorporating a memory to determine if *any* particular memory is volatile or non-volatile. (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 19-25).) This impossibility is not limited to hard disks, but applies to other types of memories as well because there is no explanation of what characteristic renders the memory volatile or non-volatile. The patent thus runs afoul of the definiteness requirement, as it fails to meet the public notice function and permit competitors to avoid infringement. *Halliburton*, 514 F.3d at 1249. It is difficult to imagine a more compelling example of a situation in which "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Honeywell,* 341 F.3d at 1341.[3] A competitor might as well flip a coin to determine whether memory is volatile or non-volatile under the claims.

---

[3] The prosecution history highlights this ambiguity. During prosecution, the Examiner rejected the claims of the patent as indefinite based on the references to "hard disk." The Examiner stated, "While applicant may be his or her own lexicographer, a term in a claim may not be given a meaning repugnant to the usual meaning of that term." (Rondini Decl. Ex. 2 at ANCA 669.) The Examiner stated that "The term 'non-volatile' in claim 1 is used by the claim to exclude 'hard disk,' while it is accepted that a 'hard disk' is 'non-volatile' as it does not lose data when the power is removed from it." (*Id.* at ANCA 670.). The applicants amended claim 1, but this amendment does not address the ambiguity. (Rondini Decl. Ex. 2 at ANCA 687 and Ex. 8 (Kelly Dep. 83:11-84:15.); Rahebi Decl. Ex. B (Kelly Decl. ¶ 28).) *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1353 (Fed. Cir. 2005) (finding claim term to be

What is Ancora's solution to the confusion created by the repeated statements in the specification that a hard disk is a volatile memory?  Ignore them.  Ancora blithely proposes a construction of "volatile memory" as "memory that is not maintained when the power is removed," *thus excluding the very same hard disk that the specification identified as volatile.*  Such an approach to claim construction is fundamentally wrong.  Contrary to what Ancora would lead one to believe, there is no "*as written*" rule of claim construction that says that if the claims make sense in a vacuum, the specification should be ignored.  (Br. at 14.)  Numerous cases make this abundantly clear, including the *en banc* decision in *Phillips:*

> The claims, of course, do not stand alone.  Rather, they are part of a fully integrated written instrument consisting principally of a specification that concludes with the claims.  For that reason, claims *must* be read in view of the specification, of which they are a part.

*Phillips,* 415 F.3d at 1315 (emphasis added); *see also Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,* 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("Claim terms are not construed in a vacuum divorced from the specification."); *Old Town Canoe Co. v. Confluence Holdings Corp.,* 448 F.3d 1309, 1318 (Fed. Cir. 2006) (The patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history.").

Ancora's proposed constructions confirm that the ambiguity the patent applicants created is insoluable.  Ancora's proposal adopts a meaning for volatile memory that excludes hard disks.[4]  Thus, the proposed construction does *not* claim what the applicants regarded as their invention. "Where it would be apparent to one of skill in the art, based on the specification, that the invention set forth in a claim is not what the patentee regarded as his invention, we must hold that claim invalid under §112, paragraph 2."  *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336

---

indefinite and holding statements made during prosecution to overcome Examiner's rejection based on indefiniteness did not resolve ambiguity).

[4] Confusing matters even more, Ancora's *own* expert Mr. Jestice disputed *Ancora's* proposed constructions of "volatile memory" and "non-volatile memory" during his deposition. After nearly one hour of conferences with Ancora's attorneys, Mr. Jestice subsequently testified that he did not think Ancora's constructions were inaccurate, but just "incomplete" because they did not require a power on cycle after power off.  (Rahebi Decl. Ex. D (Jestice Dep. 8:7-10:17; 25:13-27:25; 40:9-16).)

at 1349 (Fed. Cir. 2002) (holding claims that limited a structure to motion in a plane perpendicular to another plane invalid because specification "describes this structure in contrary terms"). *See also Rambus Inc. v. Hynix Semiconductor, Inc.,* 569 F. Supp. 2d 946, 1001 (N.D. Cal. 2008) ("This court has interpreted *Allen Engineering* as holding that a claim is invalid if the claim cannot be logically reconciled with the specification."). Here, the claims likewise cannot be logically reconciled with the specification. Ancora's contention that Apple would limit the claim terms to specific embodiments misses the mark. (Br. at 14.) There are no alternative embodiments that resolve the indefiniteness problem.

Ancora's extrinsic evidence also confirms the hopeless ambiguity here. Ancora relies on the 1998 *Microsoft Computer User's Dictionary*, quoting the definition of "non-volatile memory":

> A storage system that does not lose data when power is removed from it. Intended to refer to core memory, ROM, EPROM, flash memory.

But Ancora quoted only *part* of the definition, and omitted the bold portion below that references "disk subsystems." This portion lays bare the very ambiguity that renders the claims indefinite.

> A storage system that does not lose data when power is removed from it. Intended to refer to core memory, ROM, EPROM, flash memory**, bubble memory, or battery backed CMOS RAM, the term is occasionally used to reference <u>disk</u> subsystems as well**.

(Rondini Decl. Ex. 7 (emphasis added).)[5] Ancora's references to Apple patents that refer to volatile and non-volatile memory are of no help to it. At issue, is the undeniable ambiguity created by the *'941 specification*—not how applicants in other patents used the term. As much as

---

[5] Other technical dictionaries likewise make clear that a hard disk is "non-volatile memory." Microsoft Press Computer Dictionary (3rd ed. 1997) (reciting same definition as Microsoft Computer User's Dictionary above); Webster's New World Dictionary of Computer Terms (6th ed. 1997) and Que's Computer & Internet Dictionary (6th ed. 1995) ("**non volatile memory** The memory specially designed to hold information, even when the power is switched off. *Read-only memory (ROM)* is non-volatile as are all secondary storage units such as disk drives.") (emphasis in original); Barron's Dictionary of Computer and Internet Terms (5th ed. 1996) ("**Nonvolatile** not erased when turned off. Disks are a nonvolatile storage medium; memory (RAM) is volatile"). *See also* "**Volatile** not permanent; erased when turned off. The memory of a computer is volatile, that is, it goes blank when power is removed. Disks are nonvolatile.") (Rahebi Decl. Exs. E-H.)

la-1169876

it would like to, Ancora cannot dump its specification and adopt specifications from other patents to save its claims.

Finally, Ancora's expert attempts to reconcile the irreconcilable by arguing that a hard disk is not only non-volatile memory but also volatile memory when it serves as "virtual memory." (Rondini Decl. Ex. 5 (Jestice Decl. ¶¶ 7-8).) Ancora's argument is absurd.

First, as Apple's expert explained and Mr. Jestice admitted,[6] there is absolutely no disclosure in the '941 patent of "virtual memory" or "supplemental storage," much less of a hard disk that is non-volatile but becomes volatile when used as "virtual memory." (Rondini Decl. Ex. 8 (Kelly Dep. 118:5-8); Rahebi Decl. Ex. D (Jestice Dep. 13:18-14:16).) This litigation-inspired argument has no support.[7]

Second, the basic premise of Mr. Jestice's "virtual memory" argument is incorrect. As Mr. Jestice conceded at his deposition, data in virtual memory does not disappear when power is removed. (Rahebi Decl. Ex. D (Jestice Dep. 24:21-26:2); Rondini Decl. Ex.8 (Kelly Dep. 100:1-103:2).) To salvage his argument, Mr. Jestice suggests that the maintained data is not in a "usable form" upon power-off. (*Id.*) But whether the maintained data is usable (or not) is irrelevant. According to Ancora's own proposed constructions, the critical distinction between volatile and non-volatile memory is that data is not maintained in the former upon power off—not whether the data is usable.

---

[6] Apple's direct questioning of Mr. Jestice lasted less than 20 minutes total. At the conclusion of Apple's questioning, Ancora's counsel conferred off-the-record with Mr. Jestice for a full hour before beginning the re-direct portion of the deposition. Only after that hour-long conference did Mr. Jestice opine, for the first time, that the '941 patent discussed "virtual memory" when directed to a specific section by Ancora's counsel. Mr. Jestice's conclusory opinions, offered after his prior admission and only after extensive off-the-record coaching, should be entitled to no weight. (Rahebi Decl. Ex. D (Jestice Dep. 28:6-29:14).)

[7] This theory was disclosed for the first time in Mr. Jestice's declaration of April 30, 2012. There is no mention of it in Ancora's claim construction chart or as supporting evidence. (Dkt. No. 96, Ex. A at 1-3.) Ancora briefed the indefiniteness issue in the *Microsoft/Toshiba* action more than two years ago and did not raise the concept (SACV09-626 (MLG) (C.D. Cal) Dkt. No. 101.)

### B. "BIOS"—Claims 1-3, 5-17

| Apple's Construction | Plaintiff's Amended Construction |
|---|---|
| Software routines on IBM PC compatible computers that handle startup operations and support the transfer of data among peripheral devices. | Software routines that handle startup operations |

The parties' dispute over the term "BIOS" turns on whether the term applies to all computers or IBM PC-compatible computers, as Apple proposes. The Court must construe the term as one of ordinary skill in the art would have understood it in 1998. *See, e.g.*, *Phillips*, 415 F.3d at 1313 ("ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question *at the time of the invention*, i.e., as of the effective filing date of the patent application.") (emphasis added).

The acronym "BIOS" is set forth in the specification—14 times—without *any* discussion regarding its meaning. The patent never even indicates what the acronym stands for, *i.e.*, "basic input/output system." Therefore, where the specification does not shed light on the meaning of the term, the term "BIOS" should be construed according to its plain and ordinary meaning at the time of the invention.

Apple's proposed construction that BIOS is specific to the IBM PC-compatible computer platform is consistent with the accepted meaning from the relevant time period, as demonstrated by dictionary definitions. *See Phillips*, 415 F.3d at 1318 ("Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention."). Specifically, dictionaries from that period consistently connect BIOS with PC-compatible computers:

> A set of programs encoded in read-only memory (ROM) *on IBM PC-compatible computers*. These programs handle startup operations such as the power-on self-test (POST) and low-level control for hardware, such as disk drives, keyboards, and monitor. The BIOS programs of IBM personal computers are copyrighted, so manufacturers of IBM PC-compatible computers must create BIOSs that emulate the IBM BIOS or buy an emulation from

companies, such as Phoenix Technologies and American Megatrends, Inc.... (Rahebi Decl. Ex. F (*Webster's New World Dictionary of Computer Terms* (6th ed. 1997)); Rahebi Decl. Ex. G (*Que's Computer & Internet Dictionary* (6th ed. 1995) (emphasis added)).)

[A] set of procedures stored on a ROM chip *inside IBM PC compatible computers*. These routines handle all input-output functions, including screen graphics, so that programs do not have to manipulate the hardware directly . . . . (Rahebi Decl. Ex. H (Barron's *Dictionary of Computer and Internet Terms* (5th ed. 1996) (emphasis added)).)

*On PC-compatible computers*, the set of essential software routines that test hardware at startup, start the operating system, and support the transfer of data among hardware devices. The BIOS is stored in read-only memory (ROM) so that it can be executed when the computer is turned on. Although critical to performance, the BIOS is usually invisible to computer users. (Rahebi Decl. Ex. E (*Microsoft Press Computer Dictionary* (3rd ed. 1997) (emphasis added).)

The part of the system software *of the IBM PC and compatibles* that provides the lowest level interface to peripheral devices and controls the first stage of the bootstrap process, including installing the operating system. The BIOS is stored in ROM, or equivalent, in every PC. Its main task is to load and execute the operating system which is usually stored on the computer's hard disk, but may be loaded from CD-ROM or floppy disk at install time. (Rahebi Decl. Ex. J (*Free On-Line Dictionary of Computing*) (June 6, 1999).) [8]

These dictionaries are not the only ones that state that BIOS is specific to PC-compatible computers. In its opening brief, Ancora relies on the 1998 Microsoft Press Computer User's Dictionary in support of its constructions of several terms—*but Ancora did not disclose the definition of BIOS from the same dictionary*. (Br. at 7, 12-14; Rondini Decl. Ex. 7 (submitting seven pages of definitions).) It fully supports Apple's construction:

BIOS *n.* Acronym for **b**asic **i**nput/**o**utput **s**ystem. ***On PC-compatible computers,*** the set of essential software routines that test hardware at startup, start the operating system, and support the transfer of data among hardware devices. The BIOS is stored in ROM so that it can be executed when the computer is turned on. Although critical to performance, the BIOS is usually invisible to computer users.

(Rahebi Decl. Ex. K (*Microsoft Press Computer User's Dictionary* (1998)) (emphasis added.)

---

[8] Ancora also disputes that the BIOS handles transfer of data among "peripheral" devices. Apple's construction is fully consistent with the definitions in the technical dictionaries.

Ancora relies on the Examiner's citation during reexamination to the definition of "BIOS" in the Microsoft Computer Dictionary (5th Edition 2002) to argue "the Examiner provided an express definition during prosecution of the '941 patent." (Br. at 8.) But this dictionary definition, which the Examiner provided to the patent owner along with the Order and Notice, also fully supports Apple's construction. (Rondini Decl. Ex.3 at ANCA 2572.) It states:

> **BIOS** *n.* Acronym for **b**asic **i**nput/**o**utput **s**ystem. ***On PC-compatible computers***, the set of essential software routines that tests hardware at startup, starts the operating system, and supports the transfer of data among hardware devices, including the date and time. The operating system date is initialized from the BIOS or Real Time Clock date when the machine is booted. Many older PCs, particularly those dating before 1997, have BIOSs that store only 2-digit years and thus may have suffered from Year 2000 problems. The BIOS is stored in read-only memory (ROM) so that it can be executed when the computer is turned on. Although critical to performance, the BIOS is usually invisible to computer users. (emphasis added).

(Rahebi Decl. Ex. I.) Apple and Ancora agree that the Examiner relied on a dictionary definition of the term BIOS. However, contrary to Ancora's assertions, *the very definition from the intrinsic evidence that the Examiner cited states that BIOS is limited to PC-compatible computers*.

Ancora's reliance on the original prosecution history is similarly misplaced. The prosecution history confirms that BIOS is tied to IBM PC-compatible computers. During prosecution, the applicants referred to the BIOS in the context of PCs. In the February 5, 2002 amendment, the applicants stated, "Furthermore, it is common that all peripheral devices *in the PC* are listed and recognized by the OS except for the BIOS." (Rondini Decl. Ex. 2 (Feb. 5, 2002 Amend. at ANCA 714) (emphasis added).) The applicants stated, "Every writable device *connected to the PC* is associated with an OS file system to arrange and manage data structures." (*Id.* (emphasis added.)) Just as in the case of BIOS, the term "PC" was uniquely associated with IBM-PC and compatible computers. (Rahebi Decl. Ex. E (*Microsoft Computer Dictionary* (3rd ed. 1997) (defining "PC" as "[a] microcomputer *that conforms to the standard developed by IBM for personal computers*, which uses a microprocessor in the Intel 80x86 family (or compatible) *and can execute the BIOS.*") and Rondini Decl. Ex. 8 (Kelly Dep. 67:17-69:16).)

Immediately following these statements in the February 5, 2002 amendment, the applicants asserted that "all computers must have a BIOS." Read in context, it is apparent that this statement refers to the PCs discussed in the immediately preceding paragraphs. (Rondini Decl. Ex.2 (Feb. 5, 2002 Amend. at ANCA 714); Rahebi Decl. Ex. B (Kelly Decl. ¶ 34).) Ancora ignores these preceding paragraphs, and argues the "all computers must have a BIOS" statement should be read broadly, isolated from its context. (Br. at 9.) This is incorrect.

Moreover, even if the statement was as broad as Ancora argues, statements made during prosecution cannot be used to broaden the disclosure of the specification. *Biogen Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1140 (Fed. Cir. 2003) ("representations during prosecution cannot enlarge the contents of the specification . . ."). If the inventor wanted to define BIOS in a manner different than its ordinary meaning, the place to do it was in the specification *upon filing*— not four years later during prosecution. A patent owner is not free to insert an acronym such as BIOS into a specification as a placeholder and then fill in the blanks years later by providing an expansive definition for the acronym that is inconsistent with the plain and ordinary meaning at the time of filing. This is prohibited in the same manner as after-the-fact attempts to supplement the disclosure of an application. *See generally* 37 C.F.R 1.121(f) ("No amendment may introduce new matter into the disclosure of an application.").

In the face of a mountain of evidence that accurately reflects the usage of the term BIOS by those of skill in the art *at the relevant time period*, Ancora points to a Commodore 64 user's guide from 1983—*15 years* before the relevant time period—to argue that the Commodore 64 computer had a BIOS "[l]ong *before* IBM computers." (Br. at 9.) It is unsurprising that the term "BIOS" was not specific to IBM PC-compatible computers *before* their existence. But, as reflected above, by 1998, the term BIOS related only to PC-compatible computers.

Ancora also cites to documents created many years after the relevant time frame, but this too is irrelevant. *See, e.g. Shering Corp. v. Amgen Inc*, 222 F.3d 1347, 1353 (Fed. Cir. 2000) (The scientific meaning of a claim term "evolved with new discoveries," but "this court must determine what the term meant *at the time the patentee filed the [subject] application*.") (emphasis added); *Kopykake Enters. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001) ("when a

claim term understood to have narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean *at the time of filing*.") (emphasis added); *Datamize, LLC v. Plumtree Software, Inc*., No C 02-5693 VRW, 2004 U.S. Dist. LEXIS 28382, at *25 (N.D. Cal. July 9, 2004) ("claim language ought *not* to be defined by standards formulated after the patent's application was filed") (emphasis added).)[9]

Ancora relies on an Apple Macintosh User Guide that refers to BIOS and argues, "Apple documents from the mid-1990s confirm that Apple's 'Macintosh' brand of computers also included 'BIOS.'" (Br. at 9 (citing Rondini Decl. Ex. 10 at ANCA 2716, 2739, and 2792).) But the entire user manual is dedicated to using a Macintosh *in a PC mode* and the guide clearly distinguishes Macintoshes from PCs. That is Apple's point. (*See*, *e.g.* ANCA 2719, 2720, 2725; *see also* ANCA 2799 (instructing the user to "switch to the PC environment" and providing instruction "[t]o prevent the ROM BIOS from becoming corrupted when *the PC* is configured for 2 MB of memory").) Ancora also refers to a 1993 Info World article (Rondini Decl. Ex. 11) in which the author referred to a "Mac ROM BIOS." There is nothing to suggest that the author was one of skill in the art—in fact, the bracketing of "licensing Apple BIOS and operating system technology" makes clear that the quotation was modified. It certainly does not reflect usage in the art at the relevant time in 1998, unlike the numerous technical dictionaries cited above (including the dictionary Ancora relied on).

Ancora seeks to cast Apple's position as a "draconian" construction limiting the claims to a single brand, namely "an IBM computer." (Br. at 9). Ancora's expert similarly states that "Apple contends that BIOS is only present in 'IBM' computers." (Rondini Decl. Ex. 5 at ¶ 13.) Apple has never advanced such a construction—the question is whether BIOS is specific to the IBM PC *compatible* computer platform. Such a construction hardly limits the claims to a single

---

[9] Ancora criticizes Dr. Kelly for his "head-in-the-sand" approach because he focused on the relevant time period in construing the term BIOS. Dr. Kelly, who wrote code for Intel that implemented BIOS during the relevant time frame of 1998, offered opinions that are entirely consistent with the intrinsic evidence and the technical dictionaries at the time. (Rondini Decl. Ex. 8 (Kelly Dep. 10:15-25); Ex. B (Kelly Decl. ¶¶ 29-38).)

1  brand.  Indeed, at the relevant 1998 time frame, the term IBM PC compatible referenced the

2  dominant computing platform, and IBM PC compatibles were available from more than *200*

3  manufacturers.  (Rahebi Decl. Ex. L (http://www.microsoft.com/en-us/news/press/1998/

4  jun98/availpr.aspx) (identifying "[m]ore than 200 PC Manufacturers Deliver Windows 98 on

5  New Consumer Machines").)

6       If the inventors wanted to define BIOS differently than its plain and ordinary meaning,

7  they should have so indicated in the specification.  The inventors did not do so, and must now live

8  with the accepted meaning of the term at the time of the filing of the application.

9       **C.    "program"—Claims 1-3, 5-17**

| Apple's Construction | Plaintiff's Construction |
|---|---|
| software application that interacts with and relies on the operating system. | No construction necessary.[10] If construed: A set of instructions that can be executed by a computer. |

13      The fundamental dispute as to the term "program" is whether it is an application that

14  interacts with the operating system, as Apple proposes, or also encompasses the operating system

15  itself, as Ancora argues.  The intrinsic evidence supports Apple.  Nevertheless, Ancora again asks

16  this Court to ignore the intrinsic evidence and adopt the broadest meaning of the term, as if the

17  specification and file history did not exist.

18      The specification discloses that a "program" is an application.  The "Summary of the

19  Invention" states that "[a]ccording to the invention, each *application program* that is licensed to

20  be run on the specified computer is associated with a license record."  ('941 patent, 1:52-56

21  (emphasis added).)  In fact, the Summary refers to an "application" nine additional times.  (*Id*. at

22  2:14; 2:23; 2:31; 2:33; 2:37; 2:48; 2:50; 2:56; 3:40.)  The only program to be verified that is

23  identified in the entire specification is Lotus 123, which is an application.  (*Id*. at 2:29-32, 5:27-

24  33.)  There is no description of verifying the operating system.  (Rahebi Decl. Ex. B (Kelly Decl.

_____

26      [10] The day before filing its opening brief, Ancora changed its proposed constructions of
three terms, "program," "license record," and "verifying the program using at least the
27  verification structure," to argue in the first instance that no construction is necessary.  (Rahebi
Decl. Ex. M.)

28

¶¶ 41-42).)  Indeed, the specification refers to a "license verification application" that is already running in the computer to perform verification.  (*Id.* at 2:12-19.)  Of course, such a verifier application can only run in conjunction with the operating system that must already be running. The verifier application could not be running without the operating system running and thus could not verify the operating system.

The prosecution history of the '941 patent is consistent with the specification.  It confirms that the claimed "program" is an application that interacts with, *i.e.* runs on, an operating system ("OS"), thereby excluding the operating system itself.  (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 43-47).)  During prosecution, the Examiner rejected claims 1-23 as being unpatentable over U.S. Patent No. 6,189,146 (Misra) in view of U.S. Patent No. 5,479,639 (Ewertz) and U.S. Patent No. 5,684,951 (Goldman.)  (Rondini Decl. Ex. 2 (Feb. 5, 2002 Amendment at ANCA 711).)  In response, the applicants emphasized that their invention, in contrast to Ewertz, was directed to applications *running on* an operating system.  The applicants argued that "[s]oftware license management applications*, such as the one of the present invention, are operating system (OS) level programs*."  (*Id*. at ANCA 713 (emphasis added).)  Based on this argument, the Examiner allowed the claims to issue.  (*See* Rondini Decl. Ex. 2 at ANCA 722 (Mar. 28, 2002 Notice of Allowability at 4).)  The Examiner specifically stated that the prior art systems "do not teach licensed programs *running at the OS level* interacting with a program verification structure stored in the BIOS."[11]  (*Id*. (emphasis added).)  Thus, the prosecution history confirms that the claims are directed to confirming the license of programs running at the OS level and not the operating system itself.

As it does with "volatile memory" and "non-volatile memory," Ancora urges this Court to ignore the specification and file history and use a dictionary definition in a vacuum.  This is precisely the type of approach that the court in *Phillips* found to be wrong:

---

[11] Ancora relies on the Misra reference because it "described an 'operating system' as a type of 'program.'"  (Br. at 12.)  Whether an operating system may qualify as a program outside of the context of the '941 patent is irrelevant.  What *is* relevant is the applicants' express argument in support of patentability that *their invention* was directed to specific types of programs, *i.e.,* applications running on the operating system.

> Heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification… The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Having used the term "program" in the specification to refer only to application programs, and then emphasized this distinction during prosecution to obtain allowance, Ancora cannot now argue that its alleged invention also encompasses operating systems.[12]  *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers"); *Nystrom*, 424 F.3d at 1144 (finding narrowing language in prosecution history to be consistent with specification and limiting claim term accordingly).

In addition to a dictionary, Ancora relies on other extrinsic evidence, including a 1979 Apple II reference document and U.S. Patent No. 6,178,464, asserting that Apple views the meaning of "program" differently in this litigation as opposed to other contexts.  These references do not inform the meaning of the term "program" *as used in the '941 patent*.  (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 49-52).)  Under Ancora's approach, inventors are permitted to toss aside their statements in the specification and file history and embrace the broadest possible meaning of terms.  The law does not permit such an approach.  Where, as here, an inventor discloses one meaning for a claim term in the description of his invention, and subsequently relies on that meaning to obtain his patent, he cannot later seek refuge in the plain and ordinary meaning of that term to broaden his patent right.

---

[12] Although as in *Nystrom* it is unnecessary to determine whether the applicants' statements constitute a disclaimer because the specification and file history are consistent, Ancora cannot seriously dispute that there was a clear disavowal given the applicants express statement that "[s]oftware license management applications, such as the one of the present invention, are operating system (OS) level programs."  (Rondini Decl. Ex. 2 at ANCA 713.)

### D. "license record"—Claims 1-3, 5-17

| Apple's Construction | Plaintiff's Amended Construction |
|---|---|
| record from the licensed program that identifies the licensed program and the number of licensed users | No construction necessary. If construed: information for verifying a licensed program |

The parties disagree as to whether the term "license record" is a record that identifies the licensed program and the number of licensed users, as Apple urges, or more broadly, *information* for verifying a licensed program, as Ancora contends. Apple's proposed construction is supported by the intrinsic evidence and the expert opinion of Dr. John Kelly. Ancora's expert does not opine on the term.

The specification is clear on the meaning of "license record." The "Summary of the Invention" states that "according to the invention, each application program . . . is associated with a license record; that consists of author name, program name, and number of licensed users (for network)." ('941 patent, 1:55-58) (emphasis added). The specification further discloses that exemplary license records include "[a]pplication names (e.g., Lotus 123), Vendor name (Lotus inc.), and number of licensed copies (1 for stand alone usage, >1 for number of licensed users for a network application)." (*Id*. at 5:30-33) (emphasis added). Accordingly, the license record provides information on the scope of the license, i.e., the name of the licensed program and the number of licensed copies. If the user is using a standalone computer, the number of users will be one. If the computers are networked, the number may be more than one. (*Id*.) In either case, a number is required as part of the license record. (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 53-56).)

Ancora argues that the specification should be ignored and that "claim 1 makes no reference whatsoever" to identifying the number of licensed users. (Br. at 17.) Again, Ancora cannot divorce the claims from the specification, and the claims must be read in light of the specification. A license record must provide data about the nature of the license for it to be a record, and the specification identifies the information that is part of the record.

Ancora offers a broad construction of "license record" as *any* "information for verifying a licensed program," without any requirement that the information indicate anything about the

21

nature of the license.  Ancora's construction ignores the word "record," violating "the principle that claim language should not [be] treated as meaningless."  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) (criticizing construction that would "read limitations . . . out of the claim"); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 57-58).)  Ancora's proposed construction also runs afoul of other claim language, which distinguish between "license record" and "license information." ('941 patent, claims 15, 18, 19 (referring to "license information").)  *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("different claim terms are presumed to have different meanings").

The specification and claim language support Apple's proposed construction.  A person of ordinary skill in the art would interpret "license record" to mean a "record from the licensed program that identifies the licensed program and the number of licensed users."

**E.    "verifying the program using at least the verification structure"**

**—Claims 1-3, 5-17**

| Apple's Construction | Plaintiff's Amended Construction |
|---|---|
| confirming whether the program is licensed by comparing the license record extracted from the program to the license record in the verification structure | No construction necessary.  If construed: confirming whether a program is licensed using at least the verification structure |

The parties dispute whether "verifying the program using at least the verification structure" requires a comparison between the license record extracted from the program to the license record in the verification structure, or whether it can cover any method of verification.

Apple's construction is supported by the intrinsic evidence.  Claim 1 recites "using an agent to set up a verification structure . . . accommodating data that includes at least one license record," then "verifying the program using at least the verification structure."  (*See* '941 Patent, claim 1.)  This requires that the verification structure set up in the earlier step be used to verify the program.  (Rahebi Decl. B (Kelly Decl. ¶ 62).)  Otherwise the recited verification structure is simply floating, with no purpose.

The specification describes the verification process, which includes a comparison between the license record extracted from the program and the license record in the verification structure. Apple's proposed construction is consistent with this disclosure. Specifically, the Summary of Invention describes a "license verifier application" that accesses the program under question, retrieves therefrom the license record, encrypts the record utilizing the specified unique key (as retrieved from the ROM section of the BIOS), and compares the so encrypted record to the encrypted records that reside in the E²PROM. (*See* '941 Patent at 2:14-20 (emphasis added).) The specification further discloses that "[e]ach one of the encrypted license records [ ] is obtained by encrypting the corresponding license record as extracted from [the] program . . . ." (*Id.* at 5:39-41 (emphasis added).) Importantly, verification is accomplished by "comparing the encrypted license-software-program's license-record contents with the encrypted license-record in the . . . non-volatile memory area, or comparing the licensed-software-program's license record contents with the decrypted license-record in the . . . non-volatile memory area." (*id.* at 6:33-39; *see generally* Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 60-67).)

Ancora argues that Apple's construction is incorrect because "the details Apple seeks to inject into claim 1 are recited in dependent claim 9." This is not the case. Claim 9 contains numerous additional limitations regarding encrypting or decrypting that are not contained in Apple's proposed construction. Moreover, Ancora's reliance on 3:38-41 of the specification is misplaced because that excerpt supports Apple's proposed construction. (Br. at 19.) It is not possible to determine if the key and license record in the non-volatile memory are compatible with the extracted license record information without performing a comparison.

## V.   CLAIM STEPS MUST BE PERFORMED IN ORDER RECITED

Apple and Ancora disagree as to whether the steps claimed in the '941 patent must be performed in order. The sequential nature of the steps of claim 1 is apparent from the plain claim language and is supported by the specification. *See Mantech Envtl. Corp. v. Hudson Envtl. Servs.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998) (confirming district court's construction requiring steps be performed in order based on plain meaning and logic); *Loral Fairchild Corp. v. Sony Elecs. Corp.*, 181 F.3d 1313, 1321 (Fed. Cir. 1999) (considering language of the claim, the

specification and the prosecution history in determining that steps must be performed in the manner recited); *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08-04990 JW, 2012 U.S. Dist. LEXIS 65858, at *9 (May 10, 2012) (holding that claim implicitly required a specific order, "insofar as logic dictates that these three sub-steps must necessarily be performed in the order they are presented.")

It is readily apparent from the claim language that the steps of claim 1 must be performed in the order recited:

> 1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
>
> [1] *selecting a program* residing in the volatile memory,
>
> [2] using an agent to *set up a verification structure* in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> [3] *verifying the program using at least the verification structure* from the erasable non-volatile memory of the BIOS, and
>
> [4] acting on the program according to the verification.

('941 Patent at Claim 1 (emphasis added).)  The verification structure as recited in step 2 cannot be set up until a program has been selected in step 1 because the content of the license record required in step 2 comes from the program to be verified.  (*Id.* at 1:53-58.)  Thus, step 1 must be performed first.   Similarly, verifying the program as recited in step 3 requires using "at least the verification structure" that was set up in step 2.  Therefore, step 2 must precede step 3.  Finally, the acting "according to the verification," of step 4 can only follow the previously recited verification.  (Rahebi Decl. Ex. B (Kelly Decl. ¶ 69-73).)

The specification fully supports the requirement that the steps be performed in the order described.  (6:7-52, Fig 2.) (describing and illustrating the sequential steps as "selecting," "setting up," "verifying," and "acting.")  Figure 2 of the patent illustrates these steps in order:



SELECTING — 17
SETTING UP — 18
VERIFYING — 19
ACTING — 20

Ancora's reliance on column 1, lines 59-65 to argue that the "selecting" step need not be performed first is misplaced. (Br. at 20.) The specification states:

> Now, there commences an initial license establishment procedure, where a verification structure is set in the BIOS so as to indicate that the ***specified*** program is licensed to run on the specified computer. This is implemented by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) as an encryption key.

('941 patent, 1:59-65 (emphasis added).) Reference to "the specified program" indicates that the program has been selected, because the only way the verification structure can be set up is by obtaining the license record from the program. (Rondini Ex. 8 (Kelly Dep. 116:21-118:4).) Dependent claim 3 adds further steps to setting up a verification structure and logically can only be done in order, because each step is based upon something done in the previous step. (Rahebi Decl. Ex. B (Kelly Decl. ¶¶ 74-77).)

Ancora asserts that the specification "repeatedly" states that the order of the preferred embodiment is not limiting, making reference to a single statement in the specification. (Br. at 21.) The statement says nothing about the order being non-limiting—it simply says that the described sequence of steps is not exclusive. Such a statement cannot remove the logical requirement that when a step is done with reference to a prior operation, as recited in claim 1, it must necessarily be performed in order.

## VI. CONCLUSION

As explained above, Apple's proposed constructions are true to the specification and file history, and where necessary, the extrinsic evidence. Ancora should not be permitted to divorce its claims from the specification. Such an approach runs afoul of the public notice function of the disclosures required of patentees.

| | |
|---|---|
| 1 | Dated: June 5, 2012 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Dated: June 5, 2012

Respectfully submitted,

**MORRISON & FOERSTER, LLP**

By:\_\_/s/ Bita Rahebi\_\_\_\_\_ _____

Michael A. Jacobs
mjacobs@mofo.com
Richard S.J. Hung
rhung@mofo.com
Francis C. Ho
fho@mofo.com
Eric W. Ow
eow@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Bita Rahebi
brahebi@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street, Suite 3500
Los Angeles, CA 90013-1024
Telephone: (213) 892-5200
Facsimile: (213) 892-5454

Attorneys for Apple Inc.

26